# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. KENNETH JAMES MORRIS

**Appeal from the Circuit Court for Weakley County**
**No. 2013-CR-22    William B. Acree, Jr., Judge**

---

**No. W2013-02298-CCA-R3-CD  - Filed December 2, 2014**

---

Kenneth James Morris ("the Defendant") was convicted by a jury of manufacture of a Schedule II controlled substance within a drug-free zone and promotion of methamphetamine manufacture. The trial court sentenced the Defendant to 15 years. On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions and claims the jury improperly weighed certain testimony and incorrectly assessed the credibility of a witness. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Beau E. Pemberton, Dresden, Tennessee (at trial and on appeal), for the appellant, Kenneth J. Morris.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Thomas A. Thomas, District Attorney General; Colin Johnson (at sentencing); and Kevin McAlpin (at trial), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Weakley County Grand Jury indicted the Defendant on one count of manufacture

of a Schedule II controlled substance within a drug-free zone,[1] one count of initiation of a process intended to result in the manufacture of methamphetamine, and one count of promotion of methamphetamine manufacture. The Defendant proceeded to a jury trial on April 23, 2013. The indicted offense of initiation of a process intended to result in the manufacture of methamphetamine was dismissed at trial.

*Proof at Trial*

On October 12, 2012, Dresden Police Officer Steven Howe and Lieutenant Chris Crocker assisted Probation Officer Justin Tubbs in the "extraction" of Michael Roney, a registered sex offender, from a house located at 614 Linden Street in Dresden where Mr. Roney's GPS tracking device indicated he was living. The house was across the street from a public school. When the three officers arrive at the home, Officer Howe positioned himself at the back corner, while Officer Tubbs and Lieutenant Crocker knocked on the front door. As he was moving into position, Officer Howe saw two silhouettes in a window and heard two male voices. After being alerted that the other officers had contact, Officer Howe walked to the front of the house. Approximately six or seven feet from the front door, he smelled an "overwhelming" odor that he recognized as that of a methamphetamine laboratory. The Defendant was removed from the home by Lieutenant Crocker. Officer Howe and Officer Tubbs entered the home to search for Mr. Roney. They found him in a "back portion of the house behind a curtain" which was being used as a door. When Mr. Roney opened the curtain, Officer Howe spotted "foil sliders" and methamphetamine pipes on top of a coffee table. Mr. Roney was removed from the house and placed under arrest.

Officer Howe advised Mr. Roney and the Defendant of their rights. The Defendant consented in writing to a search of his home.[2] Rather than proceed with the search, Officer Howe requested Weakley County Sheriff's Department Investigator Randall McGowan to come to the scene. After verifying no other individuals were in the house and securing the scene, Investigator McGowan decided to obtain a search warrant. During the execution of the search warrant, the officers discovered two bags of methamphetamine, "one-pot"

---

[1] Under Tennessee law, a drug-free zone is defined as "the grounds or facilities of any school or [the area] within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center, or park." Tenn. Code Ann. § 39-17-432(b)(1) (2010).

[2] The Defendant wrote and signed a statement in the presence of the officers, which Officer Howe identified at trial. In his statement, the Defendant consented to a search of his home and asserted that he did not know Mr. Roney was a sex offender.

methamphetamine bottles,[3] scales, methamphetamine ingredients,[4] a heating device, laboratory equipment, various drug paraphernalia, and a "50-gallon drum" containing twelve to eighteen used methamphetamine bottles.[5] Two of the one-pot methamphetamine bottles were actively producing methamphetamine. Altogether, the officers found more than nineteen grams of methamphetamine. Officer Howe stated "in this house, you couldn't stick your arms out without touching some piece of a meth lab." According to Officer Howe's measurements, the house was approximately 584 feet from the public school building and approximately 126 feet from the school property.

On cross-examination, Officer Howe identified the bags of methamphetamine, foil slides, pipes, punches, and tubing as evidence found in the front bedroom where Mr. Roney was hiding and where he had spotted the two silhouettes from outside. Officer Howe testified that he found a barrel containing used methamphetamine bottles and some of the Defendant's clothing in the rear bedroom. He also noted that the officers discovered ephedrine in used methamphetamine bottles and a hidden duffle bag containing laboratory equipment. He did not believe Mr. Roney could have brought all of the evidence into the home in one night. Officer Howe acknowledged that he could not determine how long the bottles producing methamphetamine had been active, nor could he determine how long the other one-pot methamphetamine bottles had been at the house. He explained that eight months before the search, he smelled a methamphetamine laboratory odor near the home but could not confirm the source. He and other officers subsequently watched the Defendant's home for one month, but nothing occurred in that time that would have allowed him to initiate a case.

Investigator McGowan testified that he had substantial experience in methamphetamine detection, arrests, cleanup, and investigations. On October 12, 2012, he

---

[3] Officer Howe described the "one-pot" method as a "streamlined" method of producing methamphetamine. He explained that, in the past, methamphetamine laboratories were very large and required a substantial amount of equipment. The one-pot method is a new method in which all of the methamphetamine ingredients are placed in one or two bottles for production. Although this was Officer Howe's first one-pot method case, he stated that the old method and the one-pot method smell the same, though the one-pot method does not produce as strong of an odor as the old method.

[4] These ingredients included salt, Red Devil lye, "Coleman lantern fluid and filters," and various chemicals.

[5] At trial, Officer Howe identified several of these items in various photographs taken at the scene. Specifically, he identified the two bags of methamphetamine found in the front bedroom, (continued) the "50-gallon drum with numerous one-pot cook bottles in it," various parts of the laboratory that were placed in the yard for collection, methamphetamine being produced in a soda bottle, and various methamphetamine ingredients.

responded to Officer Howe's request for assistance at the Defendant's home. Investigator McGowan identified items used to manufacture methamphetamine from photographs taken at the scene. In particular, he identified a two-liter bottle containing ephedrine pills covered in camp fuel as "an active bubbling, cooking one-pot meth lab."[6] Investigator McGowan stated that he cleaned up eighteen used one-pot methamphetamine bottles and twelve homemade gas generators. Based on his experience, he believed the amount of methamphetamine discovered would be worth approximately $2,000.

On cross-examination, Investigator McGowan noted that bottles were found in all areas of the home except for one bedroom. One active methamphetamine bottle was discovered behind a chair in the living room. He acknowledged that the one-pot method is a portable method of methamphetamine production, and that there is no way to determine if all of the methamphetamine was made at the Defendant's home or who was producing methamphetamine.

Special Agent Brock Sain, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") in Memphis, testified as an expert in the field of drug identification forensic chemistry. At trial, he identified a sealed package containing two exhibits that he analyzed. He determined that the first exhibit contained 19.20 grams of methamphetamine and that the second exhibit contained 0.10 grams of methamphetamine.

Sharon Bowers Lambwood, the Defendant's aunt, testified that she was the owner of the home at 614 Linden Street. After moving to Martin, Tennessee in 2002, she allowed the Defendant to live in the home. Ms. Lambwood acknowledged that the Defendant was living in the home at the time of his arrest, but she testified that "he wasn't there very much." She was not aware of anyone else living there.

Jeff Kelly, the assistant director of schools for the Weakley County School System, testified that the system operates Dresden Middle School and Dresden Elementary in the same building on Linden Street and Highway 22.

Mr. Roney testified the Defendant's home was across the street from a school. Mr. Roney said he was prescribed pseudoephedrine the day before his arrest, and the Defendant was using it to manufacture methamphetamine in the home on the night of October 12, 2012. Mr. Roney testified that he did not know how to manufacture methamphetamine.

---

[6] Investigator McGowan also referred to this type of "meth lab" as the "shake and bake method." He confirmed that this method speeds up the manufacturing process, as it takes approximately two hours to produce methamphetamine. However, he explained that the duration of the manufacture depends on the manufacturer's expertise. He also testified that the new method produces the same smell as the old method.

On cross-examination, Mr. Roney confirmed that he pleaded guilty to initiation of a process intended to result in the manufacture of methamphetamine because he provided the pseudoephedrine, but he denied ever manufacturing the drug.

Officer Howe was recalled as a witness. Concerning the condition of the house, he stated, "The magnitude of how many articles [were] in this house, this was like one of the worse [sic] ones I've ever been in where you can't walk without hitting on something. There's no way you can live in this house and not know what's taking place."

On cross-examination, Officer Howe testified that he confiscated Mr. Roney's cell phone on the night of the arrest and that the phone contained evidence indicating that individuals were going to come by to purchase or manufacture methamphetamine. To Officer Howe's knowledge, the Defendant did not have a cell phone. Officer Howe added that the Defendant was "high" when they arrived on the scene.

At the conclusion of the State's proof, the Defendant moved for a judgment of acquittal, and the trial court denied the motion. The defense then proceeded with its case-in-chief.

Cherie Roney, a friend of the Defendant and the sister of Mr. Roney, testified that she met the Defendant through Samantha Vanwinkle, her neighbor at Southfield Apartments. The Defendant spent time at her apartment and sometimes would stay overnight because his toilet did not work and his home had no air conditioning or water. She testified that Mr. Roney was homeless and would spend time at the Defendant's home, even if the Defendant was absent. Ms. Roney admitted that she had never been in the Defendant's home.

Samantha Vanwinkle testified that she had lived at the Southfield Apartments on Linden Street for approximately five years and had known the Defendant for two years. She testified that she had never seen the Defendant intoxicated or using drugs and knew of no evidence suggesting that he used drugs. According to Vanwinkle, Mr. Roney sometimes would stay at the Defendant's home. She admitted that she had never been to the Defendant's home.

The Defendant testified he had lived at his Aunt's home at 614 Linden Street for fifteen years. At the time of his arrest, he was working in Martin. He said he drove to work in a truck owned by a co-worker who did not have a driver's license. He claimed he returned home in the late evening of October 10, 2012, and slept until approximately 10:30 the next morning. He claimed that he "never really turned on any lights [and] never paid attention to the house." The Defendant was at his home all day resting and watching television. Sometime before dark, Mr. Roney came by asking to borrow money. Mr. Roney walked with

the Defendant to a gas station to buy cigarettes. After buying the cigarettes, the Defendant and Mr. Roney walked to a Dollar General store, where Mr. Roney got in a man's truck. Before leaving, Mr. Roney asked the Defendant if he was going to return home that night. The Defendant claimed he told Mr. Roney he was going back to Martin. The Defendant explained the reason he said he was not going home was because he "just wanted a peaceful night at home" and Mr. Roney "gets on [his] nerves."

According to the Defendant, he walked from the Dollar General to his home and arrived at dusk. He stated that sometime in the middle of the night Mr. Roney came in through the back door with some type of backpack or duffle bag. The Defendant said Mr. Roney was out of breath, sweating, and looking out the window. Mr. Roney said he had been at Southfield Apartments doing laundry and thought somebody was calling the police on him because he was not allowed to be there. Mr. Roney told the Defendant that he was there to pick up some clothes before going to his Aunt Darla's home. Mr. Roney then went to the back bedroom, where, according to the Defendant, he had been staying for approximately five months. Shortly thereafter, there was a knock at the door, and the Defendant told Mr. Roney his ride had arrived. Mr. Roney was in his room and did not respond. The Defendant claimed that he went to the door and twice asked who was there, but he did not receive a reply. He told the person knocking to go to the other door, because he had coffee in his hand and needed both hands to open the door. The Defendant again yelled to Mr. Roney that his ride had arrived before going to the front door and speaking with Officer Howe.

The Defendant stated that there were issues with the plumbing, heating, air, and kitchen floor of the home. The Defendant also explained there was a lot of trash because his garbage service had been cancelled, but he asserted that he personally did not accumulate much trash. The Defendant testified that he stayed at the home one or two times per month. He said he was "around in [his] yard every day" but "hardly ever" went inside. The Defendant claimed he did not regularly purchase pseudoephedrine, but he had purchased it in the past to treat allergies.

On cross-examination, the Defendant testified that he never saw any methamphetamine-related materials in the home. The Defendant identified his footstool from a photograph. The photograph entered as an exhibit showed a foil strip, a candle, an ashtray full of cigarettes, matches, tin foil, and a screwdriver sitting on the footstool. He claimed the only items on the footstool when he spoke with the officers were coffee and a food wrapper. The Defendant explained that Mr. Roney occupied the back bedroom, but when the Defendant was not at home, Mr. Roney stayed in the den. The Defendant claimed the barrel containing used methamphetamine bottles was located in Mr. Roney's room.

On rebuttal, the State once again called Officer Howe. He explained that the evidence was not all confined in the back bedroom where Mr. Roney was staying. He stated, "[Y]ou walk through the house and you go in a room, you can't look up that you don't see some part of a meth lab." Officer Howe reiterated that the methamphetamine items were found throughout the home, including the common areas.

At the close of proof, the jury deliberated and returned a verdict of guilty for manufacture of a Schedule II controlled substance within a drug-free zone and for promotion of methamphetamine manufacture. The court sentenced the Defendant to fifteen years for manufacture and two years for promotion, with the two years running concurrently. The Defendant subsequently filed a motion for a new trial, which the trial court denied. He now appeals, arguing that the evidence is insufficient to support his convictions, and that the jury incorrectly assessed the credibility and improperly weighed the testimony of Mr. Roney.

## Analysis

### Sufficiency of the Evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). In a jury trial, the weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact best determined by the jury since they saw and heard the witnesses, and by the trial judge who concurred in and approved the verdict. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This Court will not reweigh the evidence. Id. On review, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

The Defendant argues on appeal that the evidence presented at trial is insufficient to support his convictions for manufacture of a Schedule II controlled substance within a drug-

free zone and for promotion of methamphetamine manufacture. We review each count in a multi-count indictment separately. See State v.Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433 (Tenn. Crim. App. Dec. 3, 1997) at *5; Wiggins v. State, 498 S.W.2d 93-94 (Tenn. 1973). We will discuss the sufficiency of the evidence for each conviction in turn.

Manufacture of a Schedule II Controlled Substance Within a Drug-free Zone

In Tennessee, it is an offense to knowingly manufacture a controlled substance. Tenn. Code Ann. § 39-17-417(a) (Supp. 2012). Methamphetamine is classified as a Schedule II controlled substance. See Tenn. Code Ann. § 39-17-408(d)(2) (Supp. 2012). "Manufacture" is defined as:

> the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container, except that 'manufacture' does not include the preparation or compounding of a controlled substance by an individual for the individual's own use.

Tenn. Code Ann. § 39-17-402(15) (Supp. 2012).

It is a Class B felony to knowingly manufacture point five (0.5) or more grams of methamphetamine. See Tenn. Code Ann. § 39-17-417(a)(1) and (c)(1) (Supp. 2012). Knowingly manufacturing point five (0.5) or more grams of methamphetamine in a drug-free zone is a Class A felony. Tenn. Code Ann. § 39-17-432(b)(1) (2010). Under Tennessee law, "the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, [or] preschool," is a drug-free zone. Id.

Viewing the evidence in a light most favorable to the State, we conclude that the proof presented at trial is sufficient to sustain the Defendant's conviction for manufacture of a Schedule II controlled substance within a drug-free zone. Officer Howe testified that, before entering the Defendant's home, he saw two male silhouettes talking in the den, where methamphetamine was later discovered. The Defendant and Mr. Roney were confirmed to be the only two individuals present when the officers arrived. Officer Howe also testified that he smelled an "overwhelming" odor of methamphetamine as he approached the front door. After executing the search warrant, the officers discovered a significant amount of evidence of methamphetamine manufacture, including more than nineteen grams of finished methamphetamine, used methamphetamine bottles that had "crusted over," a heating device,

lantern fuel, lye, salt, a methamphetamine pipe, scales, ephedrine, and two active methamphetamine soda bottles. Officer Howe explained that there was so much evidence of methamphetamine manufacture that "[t]here's no way you can live in [the] house and not know what's taking place."

Furthermore, Investigator McGowan testified that he immediately recognized items used to manufacture methamphetamine upon entering the home. Though he had seen hundreds of methamphetamine laboratories, he referred to the Defendant's home as "quite a bit bigger than [he] normally f[ou]nd." He testified that the one-pot methamphetamine bottles were found in all areas of the home except for one bedroom. He also stated that he was at the Defendant's home for a few hours before the officers arrived. Further, Mr. Roney asserted that he did not know how to manufacture methamphetamine and had never manufactured it in the past. Mr. Roney stated that he was aware that methamphetamine was being manufactured by the Defendant in the home on the day of his arrest. Additionally, Officer Howe testified that the Defendant's home was 126 feet from public school property and 584 feet from the public school building. Therefore, the methamphetamine was manufactured in a drug-free zone. Accordingly, we hold that there was sufficient evidence from which a rational trier of fact could determine that the Defendant was guilty of manufacturing methamphetamine within a drug-free zone.

Promotion of Methamphetamine Manufacture

The Defendant also challenges the sufficiency of the evidence for his conviction of promotion of methamphetamine manufacture, a Class D felony. See Tenn. Code Ann. § 39-17-433(f) (Supp. 2012). An individual commits promotion of methamphetamine manufacture if he or she:

> (1) Sells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use [.]

Tenn. Code Ann. § 39-17-433(a)(1) (Supp. 2012).

The evidence supporting the Defendant's conviction for methamphetamine manufacture also supports Defendant's conviction for promotion of methamphetamine manufacture. Specifically, Officer Howe and Investigator McGowan testified that equipment and ingredients used to manufacture methamphetamine, in addition to finished methamphetamine and active one-pot methamphetamine bottles, were found throughout the Defendant's home, including in the common areas. Further, Mr. Roney testified that he gave

-9-

the Defendant pseudoephedrine to manufacture methamphetamine in the home on the night of their arrest. Based on this evidence, the State established a reasonable inference that the Defendant acquired and possessed the components necessary to manufacture methamphetamine, and the jury was free to accept that reasonable inference.

In light of this evidence, we conclude that there was sufficient evidence for a rational trier of fact to convict the Defendant of promotion of methamphetamine manufacture.

*Credibility of Mr. Roney*

The Defendant also argues that the jury incorrectly assessed Mr. Roney's credibility and gave improper weight to his testimony.[7] As previously stated, the weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. Bland, 958 S.W.2d at 659. It is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v.Winters, 137 S.W.3d 641, 655 (Tenn. 2004)(citations omitted). The jury considered Mr. Roney's testimony and criminal background, determined his credibility, and weighed the value of the testimony. We decline to disturb the jury's findings by considering any testimonial inconsistencies and prior criminal convictions. Accordingly, the Defendant is not entitled to relief as to this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

---

[7] The Defendant specifically asserts that "[t]he [t]rial [c]ourt [c]ommitted [r]eversible [e]rror [i]n [s]ustaining [t]he [j]ury's [v]erdict." However, to the extent the Defendant attempts to raise a thirteenth juror issue, he has waived such issue by failing to support that issue with any references to supporting legal authority. See Tenn. Ct. Crim. App. R. 10(b). Furthermore, "the accuracy of the trial court's thirteenth juror determination is not a subject of appellate review." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). (citing State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).